# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

MOUCK SOURINHAMET,                         CASE NO. 1:09-cv-00191-SMS

                Plaintiff,

                    ORDER REVERSING THE SOCIAL
  v.                   SECURITY AGENCY'S DETERMINATION
                    AND REMANDING FOR PAYMENT OF
COMMISSIONER OF             DISABILITY BENEFITS
SOCIAL SECURITY,

                Defendant.
_____/

Plaintiff Mouck Sourinhamet seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for social security disability benefits and supplemental security income pursuant to Titles II and XVI of the Social Security Act (the "Act").  The matter is currently before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge.[1]  Following a review of the complete record, this Court concludes that the ALJ erred in rejecting Plaintiff's testimony regarding the degree of pain that she experienced and in adopting the opinions of the non-examining agency physicians over those of Plaintiff's treating physicians.  Accordingly, the Court reverses and remands for payment of benefits.

///

///

///

---

[1]  The parties consented to the jurisdiction of a United States Magistrate Judge.

I.      **Administrative Record**

   A.      **Procedural History**

   Plaintiff applied for disability insurance benefits on March 9, 2006.  AR 92-94.  The Commissioner initially disapproved Plaintiff's claim on August 11, 2006.  AR 83-87.  Plaintiff requested reconsideration.  AR 82.  A hearing was held before Administrative Law Judge James P. Berry on April 1, 2008.  AR 25-41.  On May 30, 2008, the ALJ determined that Plaintiff was not disabled and denied her application.  AR 13-24.  On July 22, 2008, Plaintiff requested review.  AR 5-12.  The Appeals Council denied Plaintiff's request for review on December 10, 2008.  AR 2-4.  Plaintiff filed a timely appeal on January 29, 2009.  Doc. 1; 42 U.S.C. §§ 1383(c)(3) and 405(g).

   B.      **Factual Record**

   Plaintiff's claimed disability had its genesis in an on-the-job accident.  On March 15, 2005, Plaintiff, a chicken packer, was injured when she was hit on the back of her head and neck by a bag of frozen chicken meat.[2]  AR 336, 338.   Dr. Dwight James, who diagnosed a cervical strain, gave Plaintiff a three-inch collar to support her neck, administered tramadol[3] and ketorolac,[4] and prescribed Voltaren® (diclofenac),[5] Zantac® (ranitidine),[6] and Soma® (carisoprodol).[7]  AR 335-338.  X-rays of Plaintiff's cervical spine were normal.  AR 335.

---

   [2]  The chicken processing line on which Plaintiff worked apparently operated on two levels, permitting items to fall from the higher tier to the lower level on which Plaintiff worked.

   [3]  Tramadol is an opiate antagonist used to relieve moderate to severe pain in patients expected to need pain relievers for a long time.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000960 (July 12, 2010).

   [4]  Ketorolac is a nonsteroidal anti-inflammatory drug ("NSAID"), administered by injection or intravenously, for short-term relief of moderately severe pain.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000918 (July 12, 2010).

   [5]  Voltaren®, enterically coated diclofenac, is a nonsteroidal antiinflammatory drug ("NSAID") used to treat arthritis.  www.drugs.com/voltaren.html (July 12, 2010).

   [6]  Zantac® (ranitidine), which inhibits stomach acid production, is used to treat ulcers and other disorders related to excess stomach acid.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000094 (July 12, 2010).  Plaintiff also has a peptic ulcer.  AR 205.

   [7]  Soma® (Carisoprodol) is a muscle relaxant that is used, in combination with rest and physical therapy, to relieve acute painful muscle strains and spasms.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000717 (July 12, 2010).

Plaintiff, who was sent home, was to be given a modified work schedule (sedentary work) from March 17 through 24 or 26, 2005.  AR 332-335.

A member of the Occupational Health Program at Valley Prompt Care Medical Clinic, Dr. James cared for Plaintiff pursuant to workers' compensation for approximately one year. Throughout that time, Plaintiff repeatedly complained of unrelenting pain, and James prescribed pain medications, referred her to specialists and for therapy and diagnostic tests, and limited her work responsibilities.

After checking Plaintiff on March 16, 2005,  Dr. James noted that Plaintiff was "improved, but slower than expected."  AR 330.  Dr. James directed that she was to be permitted to lie down for 25 minutes each hour while at work.  AR 331.  On March 17, 2005, Dr. James reported that Plaintiff, who complained of pain and lightheadedness, was not taking her medication at work but must be permitted to do so.  AR 328-29.  Her modified work schedule was to be three hours only, with permission to lie down for 45 minutes.  AR 328-29.  On March 24, 2005, Plaintiff complained of increased numbness in her shoulders and "pain in neck region."  AR 326-27.  James noted that Plaintiff's condition had not improved significantly.  AR 326.

On March 28, 2005, after Plaintiff reported that her neck pain remained the same, Dr. James recommended an MRI.  AR 323-35.  Plaintiff was to be off work until March 31, 2005. AR 325.  An MRI of Plaintiff's cervical spine performed on March 30, 2005, indicated "intervertebral disc degenerative changes . . . most prominently at C3/4 and C5/6 . . . resulting in mild spinal canal stenosis at C3/4."  AR 321, 344.  No fractures, subluxation, or acute abnormality was present.  AR 344.  On March 31, 2005, Dr. James again reported that Plaintiff was improving more slowly than expected and complaining of increased pain.  AR319-20.  He directed her to remain off work and prescribed Voltaren®, Zantac, Soma®, and Ultram® (tramadol).  AR 319-20; 337.

On April 8, 2005, Plaintiff complained of sharp pain in her upper back.  AR 318. Nonetheless, Dr. James cleared her to return to work, specifying "sedentary work only."  AR 316-318.  At her April 22, 2005 follow-up appointment,  Plaintiff complained that her neck was still painful and that her right shoulder pain had increased.  AR 315.  James noted that Plaintiff's

3

1  condition was improving, but more slowly than expected, and continued to permit "sedentary

2  work only." AR 315, 317.  The restrictions continued after the May 9, 2005 follow-up at which

3  Plaintiff reported feeling nauseous and dizzy, and being unable to sit for long periods of time (AR

4  312), and after the May 24, 2005 follow-up, at which Plaintiff reported increased pain in her neck

5  and shoulders.  AR 308, 310.  On May 24, 2005, Dr. James prescribed Soma®, Voltaren®,

6  Tagamet®,[8] and Keflex.[9]  AR 311.

7      When Plaintiff saw her family doctor for a blood pressure check on May 20, 2005, she

8  complained that her left thumb, but not her left arm, was numb.  AR 213.

9      On June 27, 2005, after Plaintiff complained to Dr. James of increased neck pain radiating

10  into her shoulders, he continued to limit her to sedentary work.  AR 304-05.  On July 7, 2005,

11  Plaintiff complained of increased neck pain radiating into her shoulders and frequent headaches.

12  AR 307.  She remained restricted to sedentary work after her July 12, 18, and 29, 2005 follow-

13  ups, at which she reported "increased pain and decreased mobility."  AR 297-03; 306-07; 313-14.

14  On July 18, 2005, Dr. James specified, "No pushing, pulling or tugging; No overhead work or

15  reaching; and absolutely no lifting over five pounds."  AR 314.  On July 29, 2005, Dr. James

16  decreased limitations on Plaintiff, permitting her to lift up to ten pounds.  AR 298.  Although

17  limitations continued, beginning on August 16, 2005, Dr. James permitted limited lifting between

18  ten and fifteen pounds.  AR 293-96.

19      On September 8, 2005, Plaintiff complained of increased pain and was returned to

20  sedentary work.  AR 291-92.  On both September 21and 28, 2005, Dr. James noted tenderness

21  and limited range of motion, but no swelling or sensory loss.  AR 286-90.  He recommended a

22  physical therapy consultation.  AR 288-90; 279-80.  Sedentary work and physical therapy

23  continued through November 16, 2005.  AR 277-78; 281-84.  On October 12 and December 15,

24  2005, Dr. James prescribed Soma®, Voltaren®, and Tagamet®.  AR 272; 285.  On November

25

26      [8]  Tagamet (cimetidine) is used to treat ulcers and other disorders associated with excess stomach acid.
27  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000628 (July 12, 2010).

28      [9]  Keflex (cephalexin) is an antibiotic used to treat pneumonia and bone, ear, skin and urinary tract
   infections.  www.ncbi.nlm.nih.tgov/pubmedhealth/PMH0000762 (July 12, 2010).

16, 2005, Dr. James again limited lifting to five to ten pounds.  AR 275-77.  On November 30, 2005, the doctor raised the weight limit to ten to fifteen pounds, where it remained through the December 29, 2005 examination.  AR 265-68; 273-74.  Because of Plaintiff's complaints of increased neck pain, Dr. James requested an orthopedic referral on December 15, 2005.  AR 267-68.

Plaintiff was again injured on or about January 3, 2006, when a machine backed up and chicken again fell on her head.  AR 264, 339.  Dr. James noted a head contusion, concussion, and cervical strain but allowed Plaintiff to return to work immediately.  AR 263, 339.  At a follow-up appointment with Dr. James on January 5, 2006, Plaintiff reported headaches and increased neck pain.  AR 262-63.  Dr. James restricted her to sedentary work and prescribed a pain medication. AR 260-62.

On January 9, 2006, Plaintiff reported that the medication did not relieve her pain and that she was having trouble sleeping.  AR259.  Dr. James requested authorization for an immediate orthopedic referral and for physical therapy.  AR 257-58.  He restricted Plaintiff to sedentary work with no lifting over two pounds.  AR 256-59.  Although Plaintiff continued to complain of pain, Dr. James increased the weight limits to ten to fifteen pounds on January 12, 2006, although he limited her work to four to six hours per day.  AR 254-55.

In a pain questionnaire completed in January 2006, Plaintiff reported that she was able to do light dishwashing, make beds, engage in some socializing, dust, and fold laundry.  AR 185. She required assistance with grocery shopping, traveling to medical appointments, paying bills, mopping and scrubbing floors, and doing laundry.  AR 185.  She required others to drive her places.[10]  AR 185.  Plaintiff indicated that she was able to walk five to ten minutes, stand ten to fifteen minutes, and sit ten to twenty minutes at a time.  AR 185.

On January 17, 2006, Plaintiff saw Dr. Reynaldo Garcia, at the Family Healthcare

---

[10]  The summary of the pain questionnaire does not specify whether Plaintiff required assistance with certain functions due to her neck and shoulder pain or as a result of her inability to communicate in English, illiteracy, or lack of a driver's license.

Network[11] for a second opinion.  AR 205.  Garcia considered the back and back pain to be "likely musculoskeletal in origin."  AR 205.  Although Plaintiff wanted to receive worker's compensation, Dr. Garcia advised her that the pain was getting better, that he would add a medication (Elavil®[12]), and that he would simply observe her progress.  AR 205.  Garcia also suggested continued physical therapy.  AR 205.

Plaintiff stopped working on January 18, 2006.  AR 92.

On January 19, 2006, orthopedist Albert Simkins, Jr., conducted an orthopedic consultation.  AR 250-53; 269-71.  Plaintiff told Simkins that she had neck and back pain, headaches, bilateral radiating pain into her arms, and numbness and weakness below her waist.  AR 269.  Simkins recommended a spinal MRI to rule out significant pathology because of Plaintiff's reports of numbness and tingling in her arms.  AR 271.

Dr. James also examined Plaintiff on January 19, 2006; Plaintiff reported neck pain with a burning sensation.  AR 249.  James limited Plaintiff to sedentary work and to lifting two pounds or less, and provided that she be allowed to lie down as needed.  AR 249.

Beginning on January 30, 2006, Jacobo Physical Therapy treated Plaintiff three times a week for two weeks for pain attributed to cervical strain, using interferential current to promote healing; soft tissue mobilization to treat trapezius and paraspinals; isotonic and isometric cervical and dorsal exercises; stretches, education, and body mechanics.  AR 342.

After reviewing six x-rays of Plaintiff's cervical spine, taken at Sierra View District Hospital on February 22, 2006, the radiologist reported:

> The cervical vertebra are normally aligned.  The vertebral bodies and posterior elements are unremarkable.  No fractures.  No appreciable joint pathology.  The disk spaces are well-preserved.

AR 341.

///

///

---

[11]  Family Healthcare Network appears to be Plaintiff's personal health care provider.

[12]  Elavil® (amitriptyline) is a tricyclic antidepressant used to treat symptoms opf depression. www.drugs.com/elavil.html (July 12, 2010).

On February 10, 2006, Plaintiff's physical therapist reported, "Patient showed little progress.  Plaintiff is not working, stated she was fired and now is worried about her future. [indescipherable] pain in both legs and numbness."  AR 240.

Between February 6 and March 16, 2006, Plaintiff continued to complain of headaches and pain, and Dr. James continued to prescribe sedentary work.  AR 231-34; 241-44.  On April 6, 2006, James concluded treatment of Plaintiff, recording "Plaintiff is permanent and stationary." AR 220.  He directed Plaintiff to arrange for follow-up care as needed. AR 230.  Although Plaintiff continued to complain of neck pain radiating into her right shoulder, James determined that Plaintiff could lift up to fifteen pounds, and engage in limited walking or standing, limited prolonged sitting, and limited repetitive use of her hands.  AR 229.

Plaintiff returned to see Dr. James less than two weeks later, complaining of continued pain.  AR 225.  James directed her not to lift over ten pounds and to avoid overhead work or reaching.  AR 225-26.

Plaintiff returned to Family Healthcare Network on February 13, 2006.  AR 203.  Dr. Kolker recorded:

> Patient comes in complaining of pain all over her body.  Plaintiff takes Soma. Plaintiff takes Vicodin.  Patient takes diclofenac.  Patient still has absolutely no relief.  Patient just does not feel very good.  Patient just feels that everything is hurting and patient feels like pain is shooting down her legs, shooting down or causing pain every where especially in the back of the neck that is the worse [*sic*].

AR 203.

Kolker questioned whether Plaintiff had somatoform disorder.[13]  AR 203.  He ordered several medical tests and a cervical spine x-ray, continued Plaintiff's prescriptions for diclofenac,

---

[13]  A somatoform disorder is a mental disorder characterized by physical symptoms that mimic physical disease or injury for which there is no identifiable physical cause.  It does not result from conscious malingering. www.merck.com/mmhe/sec07/ch099/ch099a.html (July 12, 2010).

1  Soma®, and Vicodin®,[14] and added prescriptions for Lyrica®[15] and vitamins.  AR 203.

2       On March 29, 2006, Kolker reported that Plaintiff had cervical disc disease.  AR 199.

3  Plaintiff complained that Lyrica® did not help and that the pain relief doctors were not doing

4  anything for her.  AR 199.  She continued to experience radicular neck pain extending into her

5  arms to a point above her elbows.  AR 199.  Plaintiff's hands were not affected.  Kolker noted,

6  "[W]hen I did the peripheral neuropathy exam for the hands, full perception, graphesthesia, the

7  crude touch and the light touch, they are all spared in both hands, good pulses as well.  Good

8  strength."  AR 199.   Kolker noted that surgery or injections might be helpful.  AR 199.

9       On October 3, 2006, Dr. Luztre Capili (apparently an associate of Dr. Kolker) noted that

10 Plaintiff seemed unable to understand that her chronic neck pain likely resulted from disc

11 degeneration and would always be there.  AR 197.  Capili noted "tenderness on examination,

12 although she does have some limitation o[f] motion on side to side motion and also is complaining

13 about pain whenever she tries to hyper extend her neck.  No sensorimotor deficits noted on both

14 upper and lower extremities."  AR 197.  Capili renewed Plaintiff's Norco prescription.[16]  AR 197.

15      On November 4, 2006, Plaintiff again saw Dr. Kolker, who noted that Plaintiff still had not

16 experienced any pain relief.  AR 195.  Kolker had not reviewed the MRI results and still felt

17 injections might be appropriate.  AR 195.  He prescribed two atypical pain relievers, Baclofen[17]

18 and Neurontin,[18] on a trial basis.  AR 195.

19      On November 11, 2006, radiologist Narin Siribhadra reported that an x-ray revealed a small

20 calcified plaque in the area of the supraspinatus tendon, indicating tendinitis of the right shoulder.

21

22       [14]  Vicodin is a narcotic pain reliever containing a combination of acetaminophen and hydrocodone.
   www.drugs.com/vicodin.html (July 12, 2010).

23
24       [15]  Lyrica® (pregabalin) is prescribed for neuropathic pain (pain associated with damaged nerves) and as an
   adjunct therapy for adult patients with partial onset seizures.   www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000327
   (July 12, 2010).

25
26       [16]  Norco® (hydrocodone bitartrate and acetaminophen) is a narcotic pain reliever used to relieve moderate
   to severe pain.  www.drugs.com/norco.html (July 12, 2010).

27       [17]  Baclofen is an antispastic agent and muscle relaxer.  www.drugs.com/baclofen.html (July 12, 2010).

28       [18]  Neurontin® (gabapentin) is an anti-epileptic medication used to relieve certain types of nerve pain.
   www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000940 (July 12, 2010).

AR 190-91.  Dr. Kolker's December 12, 2006, report indicates debilitating right rotator cuff tendinitis, which he was treating with a lidocaine patch (local anesthetic) and ibuprofen (nonsteroidal anti-inflammatory).  AR 188.  If that treatment was unsuccessful, Kolker intended to recommend injections or physical therapy. AR 188.

On or before December 18, 2006, Dr. Kolker referred Plaintiff to a pain specialist, Dr. J.R. Grandhe, for evaluation and treatment of her neck and back pain.  AR 220-22.  Plaintiff complained of moderate-to-severe pain in her back, neck and shoulders, and general weakness and fatigue.  AR 220-21.  Her medications were carisprodol, diclofenac, cimetidine, propoxacet, baglofen, and gabapentin.  AR 221.  Dr. Grandhe identified bilateral cervical joint arthropathy, right suprascapular neuritis with left cervical trigger points,[19] bilateral occipital neuralgia, and bilateral hip trigger points.  AR 222.  Grandhe's examination of Plaintiff found her generally to be within normal limits, although he noted:

> MUSCULOSKELETAL: Within normal limits.  Cervical spine: Restricted.  Right suprascapular neuritis is present.  Greater occipital nerves: Tender.  Lower facet joints: Tender, left and right, greater on the right than the left.  Trigger points present.  Thoracic spine: within normal limits.  Lumbar spine: Within normal limits. Sacroiliac joints: Within normal limits.

AR 221.

Grandhe also noted "[d]ecreased sensation in the upper extremities of the hands."  AR 221.  He recommended various joint blocks, steroids and the continuation of existing medication.  AR 222.

A Physical Residual Functional Capacity Assessment (SSA-4734-BK) completed for the agency by Dr. Carmen Lopez on August 1, 2006, and endorsed by Dr. Durell Sharbaugh on March 23, 2007, observed that Plaintiff's treating physician's decision to classify Plaintiff as requiring sedentary work was not supported by objective findings. AR 181. Based solely on review of Plaintiff's written records, Lopez diagnosed Plaintiff's complaint as degenerative disc disease with pain, strain, and upper extremity radiculitis.  AR 175-84.  Lopez opined that Plaintiff could occasionally lift twenty pounds and frequently lift ten pounds; stand or walk about six hours in an

---

[19]  A trigger-point consists of knotted muscle fibers considered to be responsible for referred pain in muscle strains.  www.webmd.com/pain-management/guide/trigger-point-injection (July 12, 2010).  Referred pain is pain that is perceived in a location other than the trigger point.  *Id.*

eight-hour workday; sit about six hours in an eight-hour workday; and exert unlimited pushing or pulling, subject to lifting restrictions.  AR 176.  She concluded that Plaintiff had no postural or manipulative limitations except that her ability to reach overhead was limited by the pain of her cervical strain.  AR 177-78.  Lopez attributed Plaintiff's limitations to a medically determined impairment, but determined that the severity or duration of Plaintiff's symptoms were disproportionate to the severity and duration to be expected from Plaintiff's impairments.  AR 180.  Concluding that Plaintiff's claimed limitations were not supported by her medical records, the assessment categorized Plaintiff's residual function as requiring light work with limited overhead reaching.  AR 181.

In an undated case analysis reconsidering his earlier findings based on the Family Healthcare Network report received February 5, 2007,  Dr. Sharbaugh questioned Plaintiff's credibility, noting inconsistencies between her allegations and medical reports.  AR 185-86.  He noted that, although a December 2006 examination reported that Plaintiff's cervical spine was restricted, in February 2006, both her treating physician and Dr. Grandhe noted that the cervical spine x-ray was "unremarkable."  AR 185-86.  In October 2006, Plaintiff had no sensorimotor deficiencies in either upper or lower extremities; in November 2006, Plaintiff had good pulses and no musculoskeletal limitations in her arms; in December 2006, Plaintiff had decreased sensation in both hands.  AR 186.  He summarized:

> On Recon[sideration], [claimant] has continued to be seen for neck pain with radiating [symptoms]. [Cervical]-spine x-ray in 2/06 was unremarkable.  11/06 Xray of Rt shoulder does show some tendinitis & some calcification.  Recent 12/06 exam showed the was [cervical]-spine was restricted & rt suprascapular neuritis was present; she was to start injections. [Cervical nerves] were intact. [Claimant reports] on Pain [questionnaire] that she is remarkably limited [with activities of daily living].  Although her condition may cause her to be somewhat limited, the evidence in file does not support the degree of limitations that she reports.  [Claimant] is a younger individual & it would take a less than [sedentary residual functional capacity] to allow, in which the evidence does not support. Suggest to affirm the initial decisions of a Light [residual functional capacity] [with] overhead reaching limitations.

> AR 185-86.

Estimating that he had seen Plaintiff sixty times between May 5, 2005 and March 7, 2008, Dr. Kolker prepared a residual functional capacity questionnaire on March 7, 2008.  AR 170-74.

He diagnosed degenerative disc disease that caused pain and tightness in Plaintiff's shoulders as well as constant neck and lower back pain.  AR 170.  In Kolker's opinion, Plaintiff's impairments were reasonably consistent with her symptoms and limitations.  AR 171.  He treated Plaintiff with physical therapy and with medication that resulted in drowsiness and dizziness.  AR 171.  Plaintiff's impairments "lasted or [could] be expected to last at least twelve months."  AR 171.  Plaintiff was not malingering, nor was her physical condition affected by emotional or psychological factors.  AR 171.  Kolker reported that Plaintiff occasionally experienced pain sufficient to interfere with the attention and concentration needed to perform even simple tasks, that Plaintiff could maintain attention and concentration for two hours at a time, and the Plaintiff could tolerate moderate stress levels at work.  AR 171-71.  According to Kolker, Plaintiff could walk two city blocks without rest or severe pain, and could sit or stand for one hour at a time, for up to two hours in a work day.  AR 172.  Plaintiff needed to be able to walk around for five minutes every ninety minutes and needed to be able to shift her position at will from sitting, standing or walking for five minutes every three hours.  AR 172-73.  She was able to lift less than ten pounds frequently and ten to twenty pounds occasionally, but should never lift fifty pounds.  AR 173.  Plaintiff could frequently look down, turn her head right or left, look up, and hold her head in a static position, and could occasionally twist, stoop, crouch, climb stairs, and climb ladders.  AR 173.  Because of her impairment, Kolker opined that Plaintiff was likely to miss one day of work each month.  AR 174.

Kolker ultimately diagnosed Plaintiff with degenerative disc disease.  Records of his treatment of her pain from March 29, 2007, though January 10, 2008, are included in the record at AR 156-69.  Records of nerve blocks administered by Dr. Grandhe, the pain specialist, from December 5, 2006, through March 30, 2007,  are included at AR 134-55.

### C.   Testimony

Plaintiff testified that since a forty-pound bag of chicken parts dropped on her neck at work, she has neck and shoulder pain, and her whole body shakes.  AR 29-30.  She took medications and received massages, as well as getting shots from Dr. Grandhe.  AR 30.  According to Plaintiff, the treatments did not work, and she was still in pain at the time of the hearing.  AR 30.  The

1    medications that Dr. Kolker prescribed gave Plaintiff only temporary relief.  AR 33.  Plaintiff

2    testified that, as a result of her neck and low back pain, she could carry no more than two pounds,

3    could stand for ten to twenty minutes, and could sit for thirty minutes to one hour before requiring

4    a two-to-three-hour rest.  AR 30-31.  She reported that she would require three two-hour rest

5    periods in an eight-hour day.  AR 32.  Using her hands caused pain in her arms and shoulders.  AR

6    32.

7            Instructed that Plaintiff was capable of light work, vocational expert Judith Najarian

8    testified that, because of Plaintiff's illiteracy and inability to speak English, she was limited to SVP

9    one level positions, such as meat cutter, production work, line steamer, or hand packer.  AR 38-

10   AR 39.  Numerous positions of this type exist in the California economy.  AR 38-39.  In response

11   to a hypothetical question, Najarian opined that no existing job could be performed by an

12   individual who could lift and carry only two pounds, stand two hours total, sit less than four hours,

13   and required three two-hour rest breaks in an eight-hour work period.  AR 39.  According to

14   Nazarian, no such position existed within the United States.  AR 39-40.

15   **II.    Discussion**

16          **A.    Scope of Review**

17          Congress has provided a limited scope of judicial review of the Commissioner's decision to

18   deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a

19   court must determine whether substantial evidence supports the Commissioner's decision.  42

20   U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*,

21   402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112,

22   1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as

23   adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be

24   considered, weighing both the evidence that supports and the evidence that detracts from the

25   Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the

26   evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g.,*

27   *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's

28   determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if

1  the ALJ's findings are supported by substantial evidence.  *See Sanchez v. Secretary of Health and*

2  *Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).

3  **B.      Legal Standards**

4          To qualify for benefits, a claimant must establish that he or she is unable to engage in

5  substantial gainful activity because of a medically determinable physical or mental impairment

6  which has lasted or can be expected to last for a continuous period of not less than twelve months.

7  42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental impairment of

8  such severity that he or she is not only unable to do his or her previous work, but cannot,

9  considering age, education, and work experience, engage in any other substantial gainful work

10 existing in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

11         To encourage uniformity in decision making, the Commissioner has promulgated

12 regulations prescribing a five-step sequential process for evaluating an alleged disability.  20

13 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  The process requires consideration of the following

14 questions:

15  Step one:       Is the claimant engaging in substantial gainful activity?  If so, the
                    claimant is found not disabled.  If not, proceed to step two.
16
    Step two:       Does the claimant have a "severe" impairment?  If so, proceed to
17                  step three.  If not, then a finding of not disabled is appropriate.

18  Step three:     Does the claimant's impairment or combination of impairments meet
                    or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.
19                  1?  If so, the claimant is automatically determined disabled.  If not,
                    proceed to step four.
20
    Step four:      Is the claimant capable of performing his past work?  If so, the
21                  claimant is not disabled.  If not, proceed to step five.

22  Step five:      Does the claimant have the residual functional capacity to perform
                    any other work?  If so, the claimant is not disabled.  If not, the
23                  claimant is disabled.

24  *Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995), *as amended* (1996).

25         The ALJ found that Plaintiff had not engaged in substantial gainful activity since January

26 18, 2006, the alleged onset date of Plaintiff's disability.  AR 18.  Although the ALJ found that

27 Plaintiff had two severe impairments, cervical strain and degenerative arthritis of the cervical

28 spine, he concluded that her impairments did not meet or medically equal the impairments listed in

1   20 C.F.R. Part 404, Subpart P. Appendix 1.  AR 18.  The ALJ rejected Plaintiff's reports of the

2   severity of her symptoms, concluding that objective medical evidence failed to support her claims.

3   AR 22.  Nonetheless, he concluded that Plaintiff was unable to perform her previous unskilled

4   work as a chicken packer.  AR 22-23.

5        In analyzing Plaintiff's residual functional capacity, the ALJ found that Plaintiff was

6   capable of light work.  AR 23.  Plaintiff, born March 12, 1960, was 45 years old or a younger

7   individual (aged 18 to 49) on the disability onset date.  AR 23.  She was unable to communicate in

8   English.  AR 23.  Because Plaintiff's past work was unskilled, transferability of job skills was not

9   relevant.  AR 23.  Accordingly, the ALJ concluded that, when the medical-vocational rules were

10  applied, Plaintiff was not disabled.   AR 23.  Jobs that Plaintiff could perform existed in significant

11  numbers within the economy.  AR 23.

12       **C.    Plaintiff's Claims**

13       Plaintiff challenges only the ALJ's determination at the fifth step of the analysis that she

14  possesses residual functional capacity to perform light work.  She contends that the ALJ erred (1)

15  in failing to adopt the opinion of Dr. Kolker, her treating physician; (2) in failing to adopt Dr.

16  James's limitation to sedentary work; (3) in failing to find Plaintiff's pain complaints credible; and

17  (4) in failing to find that Plaintiff is limited in overhead reaching.  The Commissioner counters that

18  the ALJ appropriately assessed credibility and properly determined Plaintiff's ability to work.

19       The sole factor at issue is whether Plaintiff is capable of light work or sedentary work.

20  Physical exertion requirements are categorized as sedentary, light, medium, heavy and very heavy.

21  28 C.F.R. § 404.1567.  The ALJ found Plaintiff to be capable of performing light work, which

22  "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects up to

23  10 pounds."  28 C.F.R. § 404.1567(b).  Although the weight lifted is relatively light, light work

24  may include "a good deal of walking or standing, or when it involves sitting most of the time with

25  some pushing and pulling of arm and leg controls."  28 C.F.R. § 404.1567(b).  For a claimant to be

26  classified as able to do light work, he or she must be capable of doing "substantially all of these

27  activities."  28 C.F.R. § 404.1567(b).

28  ///

1  Plaintiff seeks to be categorized as capable of sedentary work, which "involves lifting no

2  more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers,

3  and small tools." 28 C.F.R. § 404.1567(a).  A sedentary job involves sitting but walking and

4  standing may be required occasionally.  28 C.F.R. § 404.1567(a).  In Plaintiff's case, being

5  categorized as capable only of sedentary work necessarily results in a finding of disability.  *See*

6  Table No. 1, Part 404, Subpart P, App. 2.  Rule 201.17 provides for a finding of disability for a

7  younger individual who is unskilled and unable to communicate in English and whose previous

8  work has been unskilled.

9  **D.      The ALJ's Failure to Find Plaintiff's Pain Complaints Credible**

10  An ALJ is not "required to believe every allegation of disabling pain" or other non-

11  exertional requirement.  *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*,

12  885 F.2d 597, 603 (9th Cir. 1989).  But if he or she decides to reject a claimant's pain testimony

13  after a medical impairment has been established, the ALJ must make specific findings assessing

14  the credibility of the claimant's subjective complaints.  *Ceguerra v. Secretary of Health and*

15  *Human Services*, 933 F.2d 735, 738 (9th Cir. 1991).  "[T]he ALJ must identify what testimony is not

16  credible and what evidence undermines the claimant's complaints."  *Lester*, 81 F.3d at 834,

17  *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988).  He

18  or she must set forth specific reasons for rejecting the claim, explaining why the testimony is

19  unpersuasive.  *Orn*, 495 F.3d at 635.  *See also Robbins v. Social Security Administration*, 466 F.3d

20  880, 885 (9th Cir. 2006).  The credibility findings must be "sufficiently specific to permit the court

21  to conclude that the ALJ did not arbitrarily discredit claimant's testimony."  *Thomas v. Barnhart*,

22  278 F.3d 947, 958 (9th Cir. 2002).

23  When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for

24  truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct,

25  claimant's daily activities, claimant's work record, and testimony from physicians and third parties

26  about the nature, severity and effect of claimant's claimed symptoms.  *Light v. Social Security*

27  *Administration*, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ may consider "(1) ordinary techniques

28  of credibility evaluation, such as claimant's reputation tor lying, prior inconsistent statements

1  concerning the symptoms, and other testimony by the claimant that appears less than candid; (2)

2  unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of

3  treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th

4  Cir. 2008), *citing Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996).  If the ALJ's finding is supported

5  by substantial evidence, the Court may not second-guess his or her decision.  *Thomas*, 278 F.3d at

6  959.

7          For example, in addition to finding Mrs. Thomas's medical records did not support the

8  level of pain and the limitations to which she testified, the ALJ in *Thomas* found that Thomas had

9  an "extremely poor work history," "little propensity to work in her lifetime," and a sporadic work

10  history periodically interrupted by years of unemployment.  *Id.* Thomas, who had worked as a

11  bartender, house cleaner and concession worker, remained able to perform her own housework,

12  including cooking, laundry, washing dishes, and shopping.  *Id.* Her testimony about her drug and

13  alcohol usage was internally inconsistent and lacked candor.  *Id.* And, most compelling, Thomas

14  impeded testing during two physical capacity evaluations, demonstrating "self-limiting behavior"

15  embodying inconsistent and minimal effort.  *Id.*

16          The Ninth Circuit has summarized the applicable standard:

17          [T]o discredit a claimant's testimony when a medical impairment has been
        established, the ALJ must provide "'specific cogent reasons for the disbelief.'"

18          *Morgan*, 169 F.3d [595,] 599 [9[th] Cir. 1999) (quoting *Lester*, 81 F.3d at 834).  The
        ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.*

19          Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a
        malingerer, those "reasons for rejecting the claimant's testimony must be clear and

20          convincing." *Id.*  Social Security Administration rulings specify the proper bases
        for rejection of a claimant's testimony . . . An ALJ's decision to reject a claimant's

21          testimony cannot be supported by reasons that do not comport with the agency's
        rules.  *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the

22          same force and effect as the statute or regulations, they are binding on all
        components of the Social Security Administration, . . . and are to be relied upon as

23          precedent in adjudicating cases."); *see Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th
        Cir. 1998) (concluding the ALJ's decision at step three of the disability

24          determination was contrary to agency rulings and therefore warranted remand).
        Factors that an ALJ may consider in weighing a claimant's credibility include

25          reputation for truthfulness, inconsistencies in testimony or between testimony and
        conduct, daily activities, and "unexplained, or inadequately explained, failure to

26          seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603;
        *see also Thomas*, 278 F.3d at 958-59.

27          *Orn*, 495 F.3d at 635.

28

In this case, the ALJ rejected Plaintiff's pain complaints as inconsistent with medical evidence:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the residual functional capacity assessment for the reasons explained below.
>
> The claimant testified to an inability to work due to back pain, neck pain and shoulder pain. She stated she could lift only 2 pounds; stand for only 10 to 20 minutes at a time for a total of 2 hours in an 8 hour work day; sit for a total of 2 to 3 hours in an 8-hour workday and walk only 2 blocks. The objective medical findings and the level of treatment, however, are not suggestive of this level of severity. I n the absence of objective medical evidence to support these allegations, the ALJ gives minimal weight to this testimony. In a Pain Questionnaire, dated January 30, 200[6], the claimant reported she was markedly limited in her activities of daily living (Exhibits 26 to 28). Although her condition might cause her to be somewhat limited, the medical evidence does not support the degree of limitation that she reports. The claimant's complaints regarding the frequency, severity and duration of her neck pain, upper extremity pain, back pain and total body pain do not justify any further limitations than those based on the objective medical evidence and are generally consistent with the limitations found. The medical evidence shows only mild [degenerative disc disease] or negative (Exhibits F pages 1, 2, 4, 176-178). The records indicate the claimant got good responses from some of the treatment (Exhibits F pages 140, 142, 146). There are no reported continuous side effects of medication. When side effects are mentioned, the treatment notes reflect that the medication was adjusted or changed.

AR 22.

An ALJ may not disregard a claimant's testimony solely because objective medical evidence does not fully substantiate it. *Robbins*, 466 F.3d at 883. Unless the ALJ finds that affirmative evidence demonstrates that the claimant is a malingerer, he or she can only find the claimant's testimony not credible by making specific findings of credibility and supporting each such finding with clear and convincing evidence. *Id.* The ALJ did not do so in this case.

The ALJ did not find Plaintiff to be a malingerer. He did not consider Plaintiff's reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, or any unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment. The ALJ simply decided that, as a matter of law, Plaintiff's impairments, which he found to be severe, could not cause pain as severe as that to which Plaintiff testified. As a result, the ALJ impermissibly disregarded Plaintiff's credibility without adequate support.

E.     **Failure to Adopt Treating Physicians' Opinions**

The non-examining state agency physicians, on whose opinion the ALJ relied, determined that Plaintiff was capable of light work but Plaintiff's treating physicians, Dr. Kolker and Dr. James, opined that Plaintiff was capable of sedentary work.  The non-examining physicians relied on nothing other than their own reviews of Kolker's and James's treatment records.  Plaintiff contends that the ALJ erred in rejecting Kolker's and James's determination in favor of those of the nontreating physicians.

In resolving this issue, it is important to keep in mind that whether Plaintiff had a serious physical disability is not at issue.  Plaintiff's treating physicians, the agency physicians, and the ALJ all agreed that Plaintiff's cervical strain and degenerative arthritis of the cervical spine (degenerative disc disease) are severe impairments.  The only question before this Court is the degree to which the pain of these impairments disable Plaintiff, an inherently subjective determination.  To the extent to which no one can accurately know, simply by perusing Plaintiff's medical records, how bad her pain is or how much activity and weight bearing aggravate her pain, Plaintiff's residual functional capacity must be established by knowledgeable medical opinion.

The regulations provide that medical opinions be evaluated by considering (1) the examining relationship; (2) the treatment relationship, including (a) the length of the treatment relationship or frequency of examination, and the (b) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that support or contradict a medical opinion.  28 C.F.R. § 404.1527(d).  Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant (nonexamining physicians)." *Lester*, 81 F.3d at 830.

A treating physician's opinion is generally entitled to more weight that the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a non-examining physician. *Id.* The Social Security Administration favors the opinion of a treating physician over that of nontreating physicians.  20

18

1    C.F.R. § 404.1527; *Orn*, 495 F.3d at 631.  A treating physician is employed to cure and has a

2    greater opportunity to know and observe the patient.  *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th

3    Cir. 1987).   Particularly in a case such as this one, objective medical measures such as x-rays,

4    MRIs, and blood analysis are of limited assistance.  Because a claimant's perception of pain and

5    his or her ability to persist in the face of pain are highly individualized, a treating physician,

6    especially one with a long-term relationship with the claimant, is more likely to be able to evaluate

7    the claimant's residual functional capacity.

8           This Court's task is not to re-weigh the evidence but to determine whether the ALJ's

9    determination is supported by substantial evidence and free of legal error.  The Court must review

10    the ALJ's express reason(s) for declining to adopt a doctor's opinion and determine whether the

11    rejection was specific and legitimate.

12           **1.**    **Dr. James.**

13           James treated Plaintiff approximately bi-weekly for over a year as she recovered from her

14    workplace injuries.  James concluded his treatment of Plaintiff on April 6, 2006, reporting that

15    Plaintiff's condition was "permanent and stationary."  AR 220.  Although Plaintiff continued to

16    complain of neck pain radiating into her right shoulder, James determined that Plaintiff could lift

17    up to fifteen pounds, and engage in limited walking or standing, limited prolonged sitting, and

18    limited repetitive use of her hands.  AR 229.  When Plaintiff returned less than two weeks later, on

19    April 19, 2006, and complained of continued pain, however,  James directed her not to lift over ten

20    pounds and to avoid overhead work or reaching, restrictions tantamount to the conditions of a

21    sedentary job.  AR 225-26.

22           "If a treating physician's opinion is 'well-supported by medically acceptable clinical and

23    laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the]

24    case record, [it will be given] controlling weight.'"  *Orn*, 495 F.3d at 631, *quoting* 20 C.F.R. §

25    404.1527.  James's full treatment records of Plaintiff are included in the record.  Nonetheless,

26    "[t]he ALJ [gave] minimal weight to Dr. James' January 19, 2006, February 20, 2006 and April 19,

27    2006 assessments for sedentary work as they [were] simply not supported by the objective medical

28    findings."  AR 19.  He explained that James's "opinions" were entitled to little weight since they

1  were presented on check-off forms without objective evidence or any explanation of his

2  conclusions.  AR 19-20.

3       Individualized medical opinions are preferable to check-off reports.  *Murray v. Heckler*,

4  722 F.2d 499, 501 (9th Cir. 1983).  Nonetheless, the Ninth Circuit has not held that an ALJ may

5  reject a physician's opinion simply because it is brief or in checklist format.  *See Moore v. Astrue*,

6  2008 WL 2811983 (N.D.Cal. July 21, 2008) (No. C 07-1218 PJH).

7       "Merely to state that a medical opinion is not supported by enough objective findings 'does

8  not achieve the level of specificity our prior cases have required, even when the objective factors

9  are listed seriatim.'" *Rodriguez v. Bowen*, 876 F.2d 759, 762 (9th Cir. 1989), *quoting Embrey v.*

10  *Bowen*, 849 F.2d 418, 421 (9th Cir. 1988).  "Disability may be proven by medically-acceptable

11  clinical diagnoses, as well as by objective laboratory findings."  *Day v. Weinberger*, 522 F.2d 1154,

12  1156 (9th Cir. 1975).

13       Dr. James's medical records, although prepared on workers' compensation report forms,

14  recorded approximately one year of treatment, beginning with Plaintiff's first on-the-job accident

15  and continuing about four months past her second accident at work.  When they are read as a

16  whole, they provide a full and illuminating picture of the course of his treating Plaintiff, including

17  the use of various diagnostic techniques, referrals to physical therapists and specialty physicians,

18  and prescription of medications for pain, muscle strain, and anxiety.  The records reveal a pattern

19  in James's attempts to return Plaintiff to light work: each attempt increased Plaintiff's pain and

20  resulted in her being returned to sedentary work or full rest.

21       An ALJ may not substitute his or her own judgment for that of a treating physician so long

22  as the treating physician's opinion of an impairment's nature or severity is "well-supported by

23  medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

24  other substantial evidence."  SSR 96-2p at *1,  61 Fed.Reg. 34,490, 34,491, 1996 WL 374188

25  (July 2, 1996). The ALJ erred in disregarding the bulk of James's treatment records and in failing

26  to give due regard to the length and frequency of James's treatment of Plaintiff; the consistency of

27  the course of treatment and Plaintiff's response to it; James's referrals to specialists and physical

28  therapists; and Plaintiff's repeated inability to perform light work.

Even if the ALJ's conclusion that James's opinion was not supported by acceptable medical evidence were correct, he erred by giving the opinion only "minimal weight." In Social Security Ruling 96-2p, the Agency explained 20 C.F.R. § 404.1527:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527. . . . In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

S.S.R. 96-2p at 4 (Cum. Ed. 1996), 61 Fed.Reg. 34,490, 34,491 (July 2, 1996).

In short, the ALJ erred in minimizing Dr. James's opinion.

### 2. **Dr. Kolker.**

As James's treatment of Plaintiff pursuant to workers' compensation approached its end, Plaintiff's care reverted to her primary care physician, Dr. Kolker. Although Kolker initially questioned the legitimacy of Plaintiff's pain complaints (*see* AR 203), he ultimately came to believe that her complaints were legitimate. *See* AR 170-74. As the ALJ accurately found, in a Residual Functional Capacity Questionnaire dated March 7, 2008, Kolker opined that Plaintiff

> had the ability to lift and carry less than 10 pounds frequently and 20 pounds occasionally; stand/walk for a total of 2 hours in an 8-hour workday; sit for 2 to 4 hours in an 8-hour workday; frequently look down, turn head right or left, look up, or hold head in static position; occasionally twist, stoop, crouch and climb; grasp, turn, twist objects and reach overhead for 50% of the workday; perform fine manipulation for 90% of the workday; required periods of walking around during an 8-hour workday; required a job that permitted shifting positions at will from sitting, standing or walking; required unscheduled breaks and would miss about one day of work per month.

AR 21.

According to Kolker, these limitations applied as of May 5, 2005. AR 21.

The ALJ discounted Kolker's assessment of Plaintiff's disability, writing:

> The ALJ gives minimal weight to Dr. Kolker's assessment of disability, as it is simply not supported by the medical evidence. There is no longitudinal confirmation of consistently severe limitations that would preclude the performance of light exertional work for a continuous period of 12 months. Moreover, this opinion is brief and conclusory in form with little in the way of clinical findings to support its conclusion. Dr. Kolker's records are devoid of any description of detailed examinations or physical findings. Nor do Dr. Kolker's records contain any laboratory tests, i.e., x-rays, MRI scans which would support his opinion. Dr.

Kolker's opinion is not consistent with his own findings or other substantial evidence of record including the objective findings and observations, notes and opinions of other treating and examining physicians.  On the whole, the doctor appears to have accepted the claimant's subjective complaints, and the above-noted opinions appear reflective of a position of "advocate" for the patient. As such, Dr. Kolker's opinion is not supported by the overall evidence of the record and it is not afforded significant weight in this decisionmaking process in accordance with SSR 96-5P.

AR 21.

In evaluating a disability claim grounded in pain, the ALJ must consider all the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence, and other evidence."  20 C.F.R. § 416.929(a).  A claimant's statements about his or her pain alone do not establish disability; medical signs and laboratory findings must support a conclusion that the claimant's medical impairments could reasonably be expected to produce such pain. 20 C.F.R. § 416.929(a) and (b).  If medical signs and laboratory findings reveal impairments that could cause the persistence and intensity of pain that the claimant alleges the ALJ must consider all evidence to determine how the pain limits the claimant's capacity for work.  20 C.F.R. § 416.929 (c)(1).

Nonetheless, this Court is baffled by the ALJ's finding that Kolker's records "are devoid of any description or physical findings" and include no x-rays, MRI reports or laboratory results supporting his opinion on Plaintiff's residual functional capacity.  As with Dr. James, Kolker's records as a whole document Plaintiff's condition and chronic pain, which continued throughout the period in which Kolker treated Plaintiff and which failed to respond to the efforts of Kolker and the various specialists, particularly Dr. Grandhe, to whom Kolker referred Plaintiff for evaluation and treatment of her pain.  AR 137, 139.  By the time Kolker rendered his opinion on Plaintiff's residual functional capacity, he had treated Plaintiff at least monthly for almost three years and estimated that he had seen her sixty times.  AR 170-74.  Although test results were inconsistent, particularly with regard to cervical x-rays and MRI results, the record includes abundant evidence that something was wrong with Plaintiff's neck and shoulders that was causing her chronic pain. *See, e.g.,* AR 156 (cervical spine x-rays); AR 195 (prescription of atypical pain relievers and consideration of injections in light of MRI results); AR 188, 190-91 (Kolker's treatment of

tendinitis in Plaintiff's shoulder based on radiologist Siribhadra's x-ray findings); AR 199 (Kolker's neuropathy examination).

That the ALJ discounted Kolker's opinion of the degree of Plaintiff's disability based on insufficient diagnostic documentation makes little sense.  An x-ray, MRI, or blood test is relevant to a claimant's underlying impairment but has limited ability to resolve whether the results of the impairment limit the claimant to light or sedentary work.

Further, Kolker's opinion included no language overtly suggesting any intent to advocate on Plaintiff's behalf.  Nothing suggests that Kolker opinion had been swayed by sympathy for Plaintiff or that he was even aware that, under the application of social security regulations, a finding that Plaintiff's residual functional capacity was "sedentary" rather than "light" would result in a finding that she was disabled and entitled to benefits.[20]  Nor may an ALJ assume that doctors routinely lie to assist their patients in collecting disability benefits.  *Lester*, 81 F.3d at 832, *quoting Ratto v. Secretary, Dept. of Health and Human Services*, 839 F.Supp. 1415, 1426 (D.Ore. 1993).  In short, the ALJ erred in minimizing Kolker's opinion.

### 3.   Agency physicians.

The agency physicians' opinions contradicted Kolker's and James's opinions on Plaintiff's residual functional capacity.  The ALJ found that

> In a Physical Residual Functional Capacity Assessment form, dated August 1, 2006, the State agency medical consultant assessed the claimant had the ability to lift and/or carry 10 pounds frequently and 20 pounds occasionally; stand and/or walk for 6 hours in an 8-hour workday; sit for 6 hours in an 8-hour workday; and occasionally reach overhead.

AR 19.

If the treating or examining doctor's medical opinion is contradicted by another doctor, the Commissioner must provide "specific and legitimate" reasons for rejecting that medical opinion, supported by substantial evidence in the record.  *Lester*, 81 F.3d at 830-31; *accord Valentine v. Commissioner of Social Security Admin.*, 574 F.3d 685, 692 (9th Cir. 2009); *Orn*, 495 F.3d at 632.  "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and

---

[20]   The same cannot be said of the agency physicians or of the ALJ.

1   conflicting clinical evidence, stating [her] interpretation thereof, and making findings.'"

2   *Tommasetti*, 533 F.3d at 1041, *quoting Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

3        The ALJ observed that the agency consultant's assessment was consistent with other

4   limitations put forth in the record.  AR 19.  His conclusion is not surprising.  Agency medical

5   consultants, Dr. Carmen Lopez and Dr. Durell Sharbough, each determined RFC by reviewing

6   Plaintiff's treatment records.  *See* AR 175-186.  Lopez and Sharbough also agreed with each other

7   that their assessment of Plaintiff's treatment records supported the opinion that Plaintiff was

8   capable of light residual function capacity with overhead reaching limitations.  AR 184, 186.  The

9   sole distinction between the basis of the treating physicians' opinions and of the non-examining

10  physicians' opinions is Dr. James's and Dr. Kolker's long-term relationship with Plaintiff, their

11  interactions with Plaintiff, and their ability to directly observe her response to treatment and ability

12  to move and function.  That difference is the rationale for the agency policy favoring the opinions

13  of treating physicians.

14        "The opinion of a nonexamining physician cannot by itself constitute substantial evidence

15  that justifies the rejection of the opinion of either an examining physician *or* a treating physician."

16  *Lester*, 81 F.3d at 831.  The Commissioner may only reject the opinion of a treating or examining

17  physician, based in part on the opinion of a non-examining doctor, if additional evidence also

18  conflicts with the treating or examining physician's opinion.  *Id.  See, e.g., Roberts v. Shalala*, 66

19  F.3d 179 (9th Cir. 1995), *cert. denied*, 417 U.S. 1122 (1996) (ALJ justified in rejecting examining

20  physician's opinion where overwhelming weight of other evidence supported the ALJ's

21  conclusion); *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995) (ALJ's rejection of the

22  opinion of the examining psychologist was appropriate where that opinion conflicted with the

23  opinions of five non-examining mental health professionals, medical reports in the record, and the

24  claimant's own testimony); *Magallanes*, 881 F.2d at 751-55 (ALJ properly rejected opinion of

25  treating physicians where ALJ's decision was supported by laboratory test results, contrary reports

26  of examining physicians, and testimony from claimant that contradicted the treating physician's

27  opinion).  The nontreating physicians in this case relied only on the reports of the treating

28  physicians, not on any additional evidence.

1    Opinions of nontreating physicians are only substantial evidence when they are supported

2 by independent clinical findings and objective tests.  *Magallanes*, 881 F.2d at 751.  "Independent

3 clinical findings can be either (1) diagnoses that differ from those offered by another physician and

4 that are supported by substantial evidence, or (2) findings based on objective medical tests that the

5 treating physician has not herself considered."  *Orn*, 495 F.3d at 632 (*citations omitted*).  Here,

6 there are no independent clinical findings or objective tests.  When all examining doctors in a prior

7 case agreed that the claimant's condition resulted in constant, severe pain, the Ninth Circuit Court

8 of Appeals held that the ALJ erred in rejecting the findings of the examining doctors in favor of the

9 report of a non-treating, non-examining physician who concluded that claimant's pain did not

10 preclude substantial gainful activity.  *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984).  The

11 same result is appropriate here.  The ALJ erred in adopting the agency physician's opinions over

12 those of Doctors James and Kolker.

13    **F.    ALJ's Failure to Recognize Limitations of Plaintiff's Ability to Reach**

14    Because this Court has determined that the ALJ erred in rejecting Plaintiff's testimony

15 regarding her degree of pain and in adopting the opinions of the non-examining agency physicians

16 over the opinions of Plaintiff's treating physicians, it need not reach the question of whether the

17 ALJ erred in failing to adopt the opinions of the agency physicians that Plaintiff's ability to reach

18 was limited.

19 **III.    Conclusion**

20    "The court shall have the power to enter, upon pleadings and transcript of record, a

21 judgment affirming, modifying, or reversing the decision of the Secretary, with or without

22 remanding the cause for a rehearing."  42 U.S.C. § 405(g).  In social security cases, the decision to

23 remand to the Commissioner to award benefits is within the court's discretion.  *McAllister v.*

24 *Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).  "If additional proceedings can remedy defects in the

25 original administrative proceedings, a social security case should be remanded.  Where, however, a

26 rehearing would simply delay receipt of benefits, reversal and an award of benefits is appropriate."

27 *Id.* (citation omitted).  If the record is fully developed and further administrative proceedings will

28 ///

25

serve no useful purpose, a reviewing court should simply reverse and award benefits. *Varney*, 859 F.2d at 1399.

Accordingly, this Court orders that the administrative determination be REVERSED and the case REMANDED for payment of benefits. The Clerk of Court is hereby directed to ENTER JUDGMENT in favor of Plaintiff Mouck Sourinhamet and against Defendant Michael J. Astrue, Commissioner of Social Security.

IT IS SO ORDERED.

**Dated:     July 16, 2010** _____            _____/s/ **Sandra M. Snyder**_____
                                        UNITED STATES MAGISTRATE JUDGE